**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**SEALED**

FILED BY _____ PE _____ D.C.

Apr 12, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | |
|---|---|
| IN RE MATTER OF THE *EX PARTE* APPLICATION OF THE RENCO GROUP INC. AND THE DOE RUN RESOURCES CORPORATION FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 <br><br> Applicants. | Case No. _____ |

***EX PARTE* APPLICATION FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 AND INCORPORATED MEMORANDUM OF LAW**

The Renco Group Inc. ("Renco") and The Doe Run Resources Corporation, also known as The Doe Run Company, ("Doe Run") (together, the "Applicants") respectfully seek an *Ex Parte* Order from this Court pursuant to 28 U.S.C. § 1782 authorizing them to take discovery from Mr. Victor Careaga ("Careaga" or the "Discovery Target"), a resident of the Southern District of Florida. Applicants seek this discovery for use in a pending, confidential criminal investigation in Peru (the "Peruvian Criminal Investigation") concerning a conspiracy to defraud Renco, Doe Run and the courts of the United States, in which scheme Caeraga participated and about which Careaga possesses relevant evidence. A copy of the subpoena *duces tecum* Applicants seek to serve on Careaga is attached as **Exhibit A**.

## I.     INTRODUCTION

A large group of consolidated personal injury claims brought by Peruvian citizens in a federal court in Missouri has now been revealed to be riddled with fraud. Many of these cases appear to be the fruits of a scheme to defraud not only Renco and Doe Run, but also the courts of the United States – a scheme now the subject of the Peruvian authorities' ongoing criminal

investigation. The fraud – comprising a network of Peruvian plaintiff "recruiters" and document collectors, working on behalf of lawyers and supervised, in part, by Discovery Target Careaga – recruited some Peruvian citizens to claim  that they were injured by emissions from a metallurgical complex in La Oroya, Peru. Careaga's recruiters and others then manipulated, doctored or fabricated "evidence" to support many of those  claims. Those sham claimants joined the thousands of plaintiffs in consolidated lawsuits against Renco and Doe Run in the United States District Court for the Eastern District of Missouri (the "Missouri Lawsuits").[1]

Upon information and belief, Careaga—a disbarred lawyer who lives within the Southern District—repeatedly travelled to Peru between 2007 and 2018 to supervise plaintiff recruiters in Peru and serve as a liaison between lawyers and the Peruvian recruiters. Indeed, as set forth in detailed sworn testimony, *infra*,[2] Careaga oversaw the recruitment of plaintiffs with false claims and the gathering of "evidence" to support those claims, including overseeing the fabrication of fake documents and authorizing the subversion of public notaries through bribes to fraudulently notarize  documents. He trained recruiters in their techniques, supervised recruiters and their supervisors in turn, and continually pressured the recruiters in Peru to sign up new plaintiffs.

---

[1] The currently active cases in Missouri are consolidated under: *A.O.A. et al. v. Doe Run Resources Corp. et al.*, 4:11-cv-00044-CDP (E.D. Mo.) and *J.Y.C.C. et al v. The Doe Run Resources Corp. et al.*, 4:15-cv-01704-RWS (E.D. Mo.).

[2] The Declaration of Juan Mario Peña Flores ("**Peña Decl.**") (The Peña Decl., with its three numbered exhibits, is attached to this Application as **Exhibit B**). Mr. Peña is a Peruvian attorney who has assisted with the investigation into these matters.  The Exhibits to the Peña Decl., cited variously, *infra*, are: Peña Exhibit 1: Affidavit of Miguel Angel Curi Osorio, a recruiter. ("**Curi Aff.**"); Peña Exhibit 2: Affidavit of Richard Romero Chavez, who supervised a team of recruiters. ("**Romero Aff.**"); and Peña Exhibit 3: The *Denuncia*, the Peruvian criminal complaint. ("***Denuncia***"). Additionally, the affidavit of Lucy Esther Rojas Argandoña, a citizen of Peru whose two sons are former plaintiffs in the Missouri lawsuit and who was targeted by these fraudulent recruiting techniques (**Argandoña Aff.**) is attached to this Application as **Exhibit C**.

Accordingly, Careaga was, and may still be, intimately involved in the plaintiff recruitment and document manipulation scheme in Peru and has directly relevant information about the scheme. A deposition of Careaga and production of documents in his possession constitute evidence that not only will be used in, but is critical to, the ongoing Peruvian Criminal Investigation.

## II.    JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1782(a).  Venue in this District is proper under 28 U.S.C. § 1391 because the Discovery Target resides in this District.

## III.    RELEVANT PARTIES

### A.  The Applicants, Renco and Doe Run

Renco, headquartered in New York, New York, is a family-owned, private holding company that makes long-term investments in companies, including Doe Run, across a range of industries. Doe Run, headquartered in St. Louis, Missouri, is a privately held natural resources company and producer of lead, copper, and zinc concentrates and recycler of lead-bearing materials.

Renco and Doe Run learned the details of the fraudulent scheme described here by commissioning a private investigation in Peru, conducted by their attorneys and a private investigation firm. With that evidence, Renco and Doe Run filed a criminal complaint, known as a *Denuncia*, with the Public Prosecutor in the Office for Organized Crime in Peru. That *Denuncia* is now being investigated by the provincial prosecutor in Junín, Peru. As the complainants, Renco and Doe Run are interested persons who play an active role in the investigation and are permitted to participate in the investigation and prosecution. For example, Renco and Doe Run can submit evidence (such as is likely in Victor Careaga's possession and

which Applicants seek to obtain via this Application) to the Public Prosecutor for consideration during the investigation.

**B.  The Respondent, Victor Careaga**

For many years, disbarred Miami attorney Victor Careaga was a lead supervisor for the local plaintiff recruitment team in La Oroya, Peru. (*Denuncia* ¶ II.6; Curi Aff. ¶ 9; Romero Aff. ¶¶ 11-12.) Careaga oversaw the recruitment of plaintiffs and the gathering of supporting documents for use as evidence in the Missouri Lawsuits. (*Denuncia* ¶¶ II.1, 3.6; Curi Aff. ¶ 9; Romero Aff. ¶¶ 7, 11-12.) Specifically, Careaga:

- Led initial meetings to gather recruiters in Peru;

- Supervised the local recruitment team in Peru, instructing recruiters on strategy and tactics for signing up plaintiffs and pressing them to recruit more plaintiffs; and

- Oversaw the compilation, notarization, and falsification of plaintiffs' files, to be used as evidence in the Missouri Lawsuits.

(*See* Romero Aff. ¶¶ 7, 10-12, 19-20, 23-27; Curi Aff. ¶ 9.) Accordingly, he likely has information about all those unlawful activities.

For at least part of the time that he supervised the recruitment process, Careaga reported directly to Schlichter Bogard & Denton ("SB&D"), the Missouri law firm coordinating certain of the Missouri Lawsuits.  (*Denuncia* ¶ III.6; Curi Aff. ¶ 9.)  After being fired by that firm, he was hired to play a similar role for two other firms, Napoli Shkolnik PLLC and Rodriguez Tramont & Nunez, PA, Tramont and Nunez, P.A., which also represent plaintiffs in the Missouri Lawsuits.  Counsel in those cases has acknowledged that Mr. Careaga still works with them in connection with the Missouri Lawsuits. Mr. Careaga. Although initially Careaga was on the record as a lawyer in one of the lawsuits, his Florida law license was revoked by the Florida Bar in 2013 for unaccounted trust funds, and he was permanently disbarred in Florida in 2015 for practicing law after his license was revoked.  (*See Denuncia*, ¶ III.6; *see also In re: Petition for*

*Disciplinary Revocation of Victor Armando Careaga*, Case No. SC13-882 (Fla. S. Ct., Sept. 3, 2012) and *Permanent Disbarment on Consent*, Case No. 2015-70, 586 (11H-OSC) (Fla. S. Ct., Jun. 14, 2015), attached as **Composite Exhibit D**.)[3]

## IV.   FACTUAL BACKGROUND

### A.  The Fraudulent "Recruitment" Scheme

In or around March 2019, Renco and Doe Run hired a leading provider of investigation services in the U.S. and Latin America to investigate improprieties in plaintiff-recruitment efforts in Peru related to the Missouri Lawsuits.

Mr. Miguel Angel Curi Osorio ("Mr. Curi"), a local recruiter in Peru, approached the Applicants to confess to, among other crimes, the falsification and forgery of evidence for use in the Missouri Lawsuits (*see Denuncia* ¶¶ III.2-15), and the misrepresentations and other illicit tactics used improperly to induce plaintiffs to join the lawsuits (*see id.* ¶¶ III.16-20).  Mr. Curi later signed an affidavit, cited extensively, *infra*, which details his knowledge of the illegal activities and crimes committed as part of the plaintiff recruitment process. A second key witness, Mr. Richard Romero ("Mr. Romero"), contacted representatives of Renco and Doe Run of his own accord with evidence of wrongdoing in the recruitment of plaintiffs. Mr. Romero had been the main coordinator and recruiter in Peru and led a team of other recruiters that included

---

[3] Careaga's former stint as legal counsel in the Missouri Lawsuits is no impediment to this Application. Section 1782 already accounts for the existence of such privilege: "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." Accordingly, to the extent, if any, that Careaga might assert that information responsive to the subpoena is subject to the attorney-client privilege, that issue would be properly raised and addressed once Applicants have served the subpoena on Careaga and Careaga has asserted the privilege.  Applicants anticipate, however, that Careaga's activities did not consist in the practice of law, and that to the extent Careaga was licensed and was engaged in the practice of law, the crime-fraud exception to the privilege will apply here.

Mr. Curi.  (*See Denuncia* ¶ III.5; Curi Aff. ¶9, Romero Aff. ¶¶ 10-12.)  Mr. Romero described to the investigators his knowledge of fraud in the plaintiff recruitment scheme and the falsification of evidence by the recruitment team, and also provided an affidavit cited extensively here.

Mr. Curi, by his own account, grew increasingly uncomfortable with the recruitment team's illegal actions in Peru and believed that many of the documents—which were forged, falsified, or otherwise improper—should not be relied on "by any court."  (Curi Aff. ¶ 37.)  For example, Mr. Curi admitted that "for plaintiffs or plaintiff parents who refused to sign powers of attorney or requests, we forged their signatures on those documents."  (*Id.* ¶ 16.)  He further admitted that the team of recruiters "duplicated the documents from one plaintiff and altered them to make them appear as if they were documents from other plaintiffs." (*Id.*)  Mr. Curi added that "[w]hen necessary, we stamped altered documents with fake seals and forged signatures to make the documents appear as if they were authentic documents issued by the proper authority or institution." (*Id.*)

In addition, Mr. Curi described several fraudulent schemes to sign up plaintiffs, including working with local leaders of the *Vaso de Leche* ("Glass of Milk")—a government public assistance program in Peru—to pressure or trick low-income parents into signing up their children as plaintiffs for the Missouri Lawsuits. (Curi Aff. ¶¶ 32(b)-(c); Romero Aff. ¶ 16.) The recruiters induced local leaders of the program in La Oroya to pressure parents who wanted milk benefits to sign up their children as plaintiffs in the Missouri Lawsuits. (Romero Aff. ¶ 37.) Other times the local leaders tricked parents into unwittingly signing up their children as plaintiffs by having the parents complete paperwork they were told was needed to enroll in the milk program. (Romero Aff. ¶ 16.) In exchange for the local leaders' cooperation, the fraud

scheme's recruiters provided, among other things, food baskets, school supplies, and other benefits. (Argandoña Aff. 6 – 8, 13)

Recruiters also used another scheme to dupe parents into enrolling their children as plaintiffs, telling them that they were signing up their children to receive free Christmas gifts. (Curi Aff. . ¶ 32a.)

Mr. Romero's statements about fraud in the recruitment process are consistent with Mr. Curi's.  (*See, e.g.*, Romero Aff. ¶¶ 10-68; Curi Aff. ¶¶14-32.)  Mr. Romero's activities as a recruitment supervisor were, in turn, directly supervised by Careaga (Romero Aff. ¶ 7) who constantly pressured him and his team to sign up new plaintiffs (*Id.* ¶ 26).

Mr. Romero confirmed he and his team routinely falsified signatures on documents they needed from the parents of potential plaintiffs to support their claims in the Missouri Lawsuits. (Romero Aff. ¶¶ 46, 52-53.)  Mr. Romero also admitted that he would personally bring documents with falsified signatures to a notary in Peru and would pay the notary extra so the notary would notarize the documents illegally – i.e., without having witnessed the signature or verifying the identity of the person signing the document.   (*Id.* ¶ 62.)  Mr. Romero stated that Careaga authorized the falsification of documents and false notarizations.  (*Id.* ¶¶ 24-25, 42, 54.)

Mr. Romero likewise confirmed the recruiters' subversion of the *Vaso de Leche* program, in a strategy authorized by Careaga, and which Careaga instructed him to keep secret. (*Id.* ¶ 42.) This scheme involved the creation of an organization, called *Madres Solidarias,* which masqueraded as a charitable organization, to request recipients' names from *Vaso de Leche,* the government program which provided milk to needy families, for the purpose of recruiting potential plaintiffs for the Missouri Lawsuits. (*Id.* ¶¶ 37, 38).  With the information provided, Mr. Romero and his team would identify families that they should approach and attempt to

recruit. (*Id.* ¶ 39). If a family could not be located to complete the documentation required by Careaga to prepare a complaint, Mr. Romero and his team would fabricate the missing documents. (*Id.* ¶ 40).

Attorneys for the Missouri Lawsuit plaintiffs have acknowledged in pleadings filed there that they assembled and supervised this team in La Oroya to liaise with plaintiffs, collect documents and conduct other tasks – all following a protocol established and overseen by the attorneys.[4]

These recruitment schemes targeted individuals like Lucy Esther Rojas Argandoña.

Ms. Argandoña is a Peruvian citizen whose two sons are former plaintiffs in the Missouri lawsuit. (Argandoña Aff. ¶¶ 2, 5.) Ms. Argandoña was deceived into signing documents, which she believed were intended to acknowledge that she would receive school supplies for her sons. (*Id.* ¶ 6.) Later, she discovered that her children had been enrolled as plaintiffs in the Missouri Lawsuit, even though she wanted nothing to do with the lawsuit.  (*Id.* ¶ 10.)

**B.  The Criminal Complaint (*Denuncia*) in Peru**

Renco and Doe Run filed the *Denuncia* in the Provincial Prosecutor's Office for Organized Crimes in Lima, Peru, on December 21, 2020. (Peña Decl. ¶ 13.) On December 29,

---

[4] "Since at least 2014, the Plaintiffs' Litigation Team has worked with and supervised a team of La Oroya residents to assist in our interactions with clients in La Oroya and surrounding towns (the "La Oroya Team"). Under the Plaintiff's Litigation Team's supervision, the La Oroya Team performs various tasks in the region, including providing, explaining, and obtaining information and signed documentation from parents or guardians of children who are involved, or intend to be involved, in the La Oroya Litigation ("Plaintiff's Guardians"). *J.Y.C.C. et al. v The Doe Run Resources Corporation, et al.*, 4:15-cv-01704-RWS, E.D. Mo., Affidavit of Francisco B. Rodriguez, November 25, 2020 (DE 434-1, ¶¶ 4 – 5). "Plaintiffs' counsel works with and supervises a team of La Oroya residents to assist in our interaction with clients in La Oroya and surrounding towns (the "La Oroya Team"). Under counsel's supervision, the La Oroya Team obtains the information necessary to complete a form Plaintiff Profile Sheet for each child." *J.Y.C.C.*, Memorandum of Law in Opposition to Defendants' Renewed Motion to Show Cause and Request for Sanctions, June 4, 2021 (DE 508 at p. 7).

2020, the Office confirmed receipt of the *Denuncia* and informed complainants that their filing would be referred to the Provincial Prosecutor's Office for Organized Crimes in the province of Junín, where La Oroya is located. (Peña Decl. ¶ 16.) A criminal *denuncia* in Peru functions like a criminal complaint and mandates the initiation of an investigation by a prosecutor in Peru.  Thus, following Renco and Doe Run's formal filing of the *Denuncia*, the Provincial Prosecutor's Office launched a formal preliminary criminal investigation into the crimes alleged there. (Peña Decl. ¶¶ 18.)

Renco and Doe Run are both complainants and victims in the criminal *Denuncia*. Accordingly, as *either* a complainant or a victim, Renco and Doe Run both have the right under Peruvian law to play an active role in the Peruvian Criminal Investigation and to receive updates on the investigation's progress. Most notably, Renco and Doe Run can submit evidence to the prosecutors and can propose additional discovery targets during the preliminary investigative phase. (Peña Decl. ¶ 18.)

In the *Denuncia*, Renco and Doe Run allege "a criminal organization engaged in the recruiting of plaintiffs to bring lawsuits against [Renco and Doe Run] for the illegal creation and falsification of documents, among other instruments, has been created," and has "allegedly committed various illegal acts to be able to support the litigation claims [in the Missouri Lawsuits]" (*Denuncia* ¶ III.3.  Specifically, the *Denuncia* alleges that through the illicit plaintiff recruitment scheme, individuals in Peru committed serious criminal offenses under Peruvian law, including (i) aggravated fraud; (ii) document tampering; (iii) procedural fraud; (iv) falsification of official seals and stamps; (v) misrepresentation; and (vi) organized crime. (*Denuncia*, at 1.)

The *Denuncia* requests that a prosecutor in Peru "proceed with an investigation" to (i) "confirm that the facts reported are true"; (ii) "determine the corresponding criminal

liabilities"; and (iii) "carry out any coercive measures *in rem* or *in personam* as may be required." (*Id.* at 13.) Notably, the *Denuncia* cautions that "both the affiant [*i.e.*, Mr. Curi] and the other persons mentioned in this complaint may have further evidence that could be destroyed or witnesses that could be influenced by powerful people to hide the truth in order to avoid their criminal liability." (*Id.*) One such person mentioned in the *Denuncia* is Careaga, the Discovery Target in this Application. (*See id.* ¶ III.6.)

### C. The Criminal Investigation by the Peruvian Prosecutor

The criminal investigation was assigned to the Organized Crime Unit in Junín, Peru on or around December 29, 2020. (Peña Decl. ¶ 16.) The prosecutor has commenced interviewing witnesses and collecting  evidence and, throughout the investigation, Renco and Doe Run can continue to gather and provide additional or corroborating evidence to the prosecutor for consideration. (Peña Decl. ¶ 18.) They can also propose additional parties to subpoena or interview, as well as propose certain seizure orders. (*Id.*) The evidence that Renco and Doe Run can present to the Peruvian prosecutor may include evidence obtained from Careaga through this Section 1782 application. (*Id.*) The prosecutor, of course, remains in control of the investigation.

Following the Peruvian prosecutor's investigation of the alleged crimes detailed in the *Denuncia*, the prosecutor can decide to bring formal criminal charges against one or more individuals or entities in Peru. (*Id.* ¶ 20.) If charges are brought, the prosecutor will present the charges to a judge. (*Id.*) If the judge agrees there is enough evidence to pursue the charges, then a formal criminal case is filed, eventually resulting in a criminal trial. (*Id.*) If the prosecutor decides to terminate the criminal proceedings, that decision is reviewed by a judge who can affirm the dismissal or remit the decision to a superior prosecutor for reconsideration. (*See* Criminal Procedure Code of Peru, Art. 344-47; *Denuncia* ¶ 21.)

Thus, there is a current and ongoing criminal investigation being conducted by a prosecutor in Peru, in which Renco and Doe Run are the complainants, as well as the victims of the alleged criminal scheme.  Based on the investigation, the prosecutor may bring criminal charges and, with a judge's permission, file a criminal case in Peru against one or more suspects.

## V.     RELIEF REQUESTED

By this Application, Renco and Doe Run seek permission to take discovery from Careaga for use in the ongoing Peruvian Criminal Investigation into an alleged criminal conspiracy to defraud Renco, Doe Run and the courts.

Careaga played a central and directory role in the fraudulent recruitment scheme. As the supervisor of the recruitment process in Peru, and as liaison to the U.S. legal team that brought the Missouri Lawsuits, Careaga will certainly have information and evidence material to the Peruvian Criminal Investigation, including information about (i) the instructions given to the recruitment team in Peru; (ii) the forgery, falsification and false notarization of official Peruvian records for use in the Missouri Lawsuits; (iii) improper payments, inducements, or other misrepresentations made to individuals in Peru to enroll them as plaintiffs in the Missouri Lawsuits; (iv) bribes paid to local officials in Peru to buy their support of the plaintiff recruitment and the Missouri Lawsuits; (v) the use of illegally-obtained evidence in the Missouri Lawsuits; and (vi) the identities of others involved in the fraud.

## VI.     MEMORANDUM OF LAW

### A.  28 U.S.C. § 1782

Section 1782 authorizes District Courts to order persons located in the United States to produce discovery for use in foreign legal proceedings. 28 U.S.C. § 1782(a). The "scope of

assistance federal courts could provide for foreign proceedings" under Section 1782 has been "substantially broadened" over time.  *In re Clerici*, 481 F.3d 1324, 1331 (11th Cir. 2007).

To obtain discovery under Section 1782, an applicant must show: (i) the person from whom discovery is sought resides or is found within the District; (ii) the request seeks evidence, whether the "testimony or statement" of a person or the production of a "document or other thing"; (iii) the discovery is "for use" in a proceeding before a foreign or international tribunal, "including criminal investigations conducted before formal accusation"; and (iv) the applicant is an interested person.  28 U.S.C. § 1782; *Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014).

Once the statutory prerequisites are met, courts consider four discretionary factors set forth by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004): (i) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (ii) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (iii) whether the application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies"; and (iv) whether the discovery sought is "unduly intrusive or burdensome[.]" *Id.* at 264-65.

District courts have broad discretion in granting judicial assistance to foreign tribunals to obtain evidence for use in a foreign proceeding. *In re Clerici*, 481 F.3d at 1324; *In re Application of Mesa Power Grp., LLC*, 878 F. Supp. 2d 1296, 1301 (S.D. Fla. 2012) ("Congress has intentionally granted the district courts broad discretion in granting judicial assistance under § 1782.").

This Application easily satisfies Section 1782's statutory prerequisites and all four discretionary *Intel* factors, so that a grant of the Application is warranted.

1.    **The Application Satisfies the Statutory Requirements of 28 U.S.C. § 1782.**

   *a. The Discovery Target resides in the Southern District of Florida.*

The Discovery Target, Victor Careaga, resides or is otherwise found in this District, in Miami-Dade County.  Public information lists his most recent address as 7771 NW 7th Street, Apartment 521, Miami, Florida 33126.  Other public sources confirm that Careaga resides in this District. He holds an active Florida license as an insurance agent which lists his business and mailing address as 9252 W 33 Way, Hialeah Gardens, Florida 33018, in Miami-Dade County. On the State of Florida Division of Corporations website, he is listed as the registered agent and vice president for Cabo Group, Inc. with an address in Miami, Florida. And Careaga's June 2015 Disbarment on Consent filed before the Florida Supreme Court, lists both his record bar address and other known addresses in Miami and Medley, Florida. Public record evidence of Careaga's residence within the district is attached as **Composite Exhibit E**.

Accordingly, this Application satisfies the prerequisite that Careaga resides or can be found in the Southern District of Florida.  *See, e.g.*, *In re Novoship (UK) Ltd.*, No. 20-60876-MC, 2020 WL 3286308, at *3 (S.D. Fla. June 18, 2020) (it is sufficient that the "persons from whom discovery [is sought] reside in the Southern District of Florida"); *In re O'Keeffe*, 660 F. App'x 871, 872 (11th Cir. 2016) (upholding Section 1782 discovery from a resident of Palm Beach); *see also In re Request for Int'l Judicial Assistance from the Norrkoping Dist. Court, Sweden*, 219 F. Supp. 3d 1061, 1062 (D. Colo. 2015) (holding "the request indicates that an address in Denver, Colorado is [the discovery target]'s last known address" to satisfy the first statutory requirement of Section 1782).

**b. The request seeks "evidence" within the meaning of Section 1782.**

This Application seeks specific, targeted documentary and testimonial evidence from Careaga. *See* Exhibit A; *see also*, *Consorcio Ecuatoriano*, 747 F.3d at 1269 (affirming an application that "seeks evidence in the form of document production and deposition testimony" as proper under Section 1782); *Novoship*, 2020 WL 3286308, at *3 (subpoenas seeking testimony and production of documents satisfy this requirement).

**c. The evidence requested is "for use" in the Peruvian Criminal Investigation, a "foreign proceeding."**

The discovery sought through this Application is for use in the ongoing Peruvian Criminal Investigation into the fraudulent plaintiff recruitment scheme. This requirement is liberally construed, and courts have "great leniency" in their discretion with respect to its application. *In re Furstenberg Fin. SAS*, No. 16-MC-60266, 2016 WL 10707012, at *5 (S.D. Fla. July 27, 2016), *aff'd sub nom. Application of Furstenberg Fin. SAS v. Litai Assets LLC*, 877 F.3d 1031 (11th Cir. 2017).

*First*, the "for use" requirement is met where the applicant is, or will be, a party to a foreign proceeding or investigation with procedural rights to submit evidence, without regard as to whether the evidence will ultimately be admissible in the foreign tribunal. *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017) (finding the "for use" statutory requirement met where the applicants were "parties to that [foreign] proceeding," and "retain[ed] the procedural right to submit the requested documents to the magistrate overseeing the investigation"); *see also In re Bernal*, No. 18-21951-MC, 2018 WL 6620085, at *4 (S.D. Fla. Dec. 18, 2018) (relying on the Second Circuit's decision in *In re Accent Delight Int'l*, 869 F.3d 121 (2d Cir. 2017), and holding the applicant satisfied the "for use" prong because he "has the practical ability to inject the requested information into the foreign proceeding").

Here, there is no question that Renco and Doe Run, as the complainants in the Peruvian Criminal Investigation, are both parties to that proceeding. (Peña Decl. ¶ 18.) Further, under Peruvian law, Renco and Doe Run have the right to submit evidence to the prosecutors and help guide the investigation, including by making suggestions about whom to interview. (*Id.*) Thus, they can "inject" the evidence obtained here into the Peruvian Criminal Investigation. (*Id.*)

**Second**, the Peruvian Criminal Investigation qualifies as a "foreign proceeding" under Section 1782. Indeed, in describing the kinds of foreign proceedings for which Section 1782 permits discovery, the statute expressly includes "criminal investigations conducted before formal accusation." 28 U.S.C. § 1782(a); *see also Intel*, 542 U.S. at 258 (holding that proceedings that have not "progressed beyond the investigative stage" can qualify for discovery under Section 1782).

Ongoing foreign criminal investigations, like the Peruvian Criminal Investigation here, satisfy the "for use" requirement. *See, e.g.*, *In re Application of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*, No. 08-20378-MC, 2011 WL 181311, at *9 (S.D. Fla. Jan. 19, 2011) (ongoing criminal investigation in Honduras by the Public Prosecutor's Office qualifies as a foreign proceeding for purposes of Section 1782, even though formal charges had not been brought); *In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*, 648 F. Supp. 464, 466 (S.D. Fla. 1986), *aff'd*, 848 F.2d 1151 (11th Cir. 1988) (a request for "production of certain documents in order to assist an ongoing criminal investigation" conducted by the Director of Public Prosecutions of Trinidad and Tobago and the Trinidad and Tobago Police Service satisfies this requirement); *In re Request from Czech Republic Pursuant to Treaty Between U.S. & Czech Republic on Mut. Assistance in Criminal Matters in Matter of Tomka*, No. 3:07-MC-47-J-32TEM, 2007 WL 4049949, at *2 (M.D. Fla. Nov. 15, 2007) (Section 1782

discovery was properly sought "for use" in a criminal investigation conducted by the District Attorney's Office in Prague).

In fact, Peruvian criminal investigations conducted by a state prosecutor, like the Peruvian Criminal Investigation, satisfy this requirement. *See, e.g., Campos-Alvarez v. Newmont Mining Corp.*, No. 1:14-CV-00208-REB, 2015 WL 1228262, *2 (D. Colo. Mar. 16, 2015) (discovery sought for use in a Peruvian criminal investigation conducted by a local prosecutor and a related civil action satisfied the Section 1782 requirements.) Indeed, the statute's "for use" requirement would have been satisfied even if the Peruvian prosecutor had not yet opened a formal criminal investigation. In *Intel*, the Supreme Court held that the proceeding for which discovery is sought under Section 1782 must be "within reasonable contemplation, but need not be 'pending' or 'imminent.'" 542 U.S. at 243.  Applying this standard, the Eleventh Circuit in *Consorcio Ecuatoriano* granted a Section 1782 application where the applicant company had obtained evidence through an internal audit that two former employees had been involved in an overbilling scheme, based on which it could bring civil and criminal actions in Ecuador. 747 F.3d at 1266.  The court concluded that those "future proceedings" were "more than speculative" and therefore concluded that the statute's "for use" requirement was satisfied.  *Id.* at 1270.

Likewise, this court in *Furstenberg* concluded that a *contemplated* criminal complaint in Luxembourg satisfied the elements of Section 1782, observing that "1782(a) covers criminal *investigations* conducted *before* formal accusation." 2016 WL 10707012, at *5 (emphasis in original). The court found that the requirements of Section 1782 were satisfied regardless of whether the applicants would file a complaint with a claim for damages filed against a party, which would proceed in front of an investigating magistrate judge or criminal court, or rather a

"denunciation" made to a state prosecutor, who could later bring charges (both being types of criminal proceedings that private parties can commence in Luxembourg). *Id.* at \*6.

Here, the ongoing Peruvian Criminal Investigation is well beyond the "reasonable contemplation" stage – in fact, it is underway. Not only has the investigation revealed evidence of wrongdoing under Peru's criminal code, but Renco and Doe Run have used that evidence to file a criminal *denuncia* with the State Prosecutor in Peru on December 21, 2020, who has initiated a formal criminal investigation in Peru. Peña Decl. ¶¶ 13, 15-16.

### d. Renco and Doe Run are "interested persons."

The Applicants here are "interested persons" under the statute because they both are the complainants in the Peruvian Criminal Investigation and the victims of the fraud.  In *Intel*, the Supreme Court rejected the argument that only litigants (but not complainants) can be "interested person[s]" under Section 1782 and found that a complainant who "has a significant role in the [investigation] process" and possesses "participation rights," including "the right to submit information" during the investigation, was an "interested person." 542 U.S. at 256-57. While the facts of *Intel* involved an antitrust investigation conducted by the European Commission, this Court has applied its holding in the context of a criminal investigation, concluding that "[w]hen criminal actions are commenced in which Applicants are complainants," as is the case here, "they would possess these 'participation rights' upon which the Court relied in *Intel* to determine the applicants in that case were 'interested persons.'" *Furstenberg*, 2016 WL 10707012, at \*4.

Accordingly, because Renco and Doe Run are the complainants in the Peruvian Criminal Investigation (in addition to being the victims), they qualify as an "interested person" and this statutory requirement is met. *See id.* ("[B]ecause Applicants will be parties in a criminal action against JMP, thus possessing the 'participation rights' relied upon by the Supreme Court, this Court finds that Applicants satisfy the 'interested persons' element of Section 1782.").

2.      **All the *Intel* Discretionary Factors Favor Granting the Application.**

Not only does this Application satisfy the statutory requirements of Section 1782, but each discretionary factor under the Supreme Court's *Intel* decision supports granting the Application.

### a.   *The Discovery Target is not a party to the foreign proceeding.*

This factor supports Section 1782 discovery when the discovery target is *not* a participant in the foreign proceeding because "nonparticipants in foreign proceedings may be outside the foreign tribunal's jurisdictional reach; thus, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264. Just so here. Careaga is not a participant in the Peruvian Criminal Investigation. *See, e.g.*, *In re Republic of Argentina*, 2020 WL 3046029, at *2 (S.D. Fla. Feb. 12, 2020) (holding that when the discovery target "is not a party to the foreign proceeding . . . the first factor weighs in favor of Petitioner").

While it is possible that Careaga could become a target of the Peruvian Criminal Investigation, the fact that he resides in Florida means he is outside the jurisdictional reach of the Peruvian prosecutors and court. Peña Decl. ¶ 25; *see also* Composite Exhibit E. Accordingly, even in that circumstance, the evidence that Careaga has in his possession "may be unobtainable" without Section 1782 discovery, thus weighing in favor of granting the instant Application. *Intel*, 542 U.S. at 264; *see also In re Clerici*, 481 F.3d 1324, 1335 (11th Cir. 2007) (finding this factor weighs in favor of Section 1782 discovery for a respondent who is a party to the foreign proceeding but who left the jurisdiction and is in Florida).

### b.   *The foreign tribunal is receptive to the requested discovery.*

This factor weighs against granting a Section 1782 application only if there is "authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of § 1782." *In re MTS Bank*, No. 17-21545-MC, 2017 WL 3276879, at *8 (S.D. Fla. Aug. 1, 2017)

(emphasis in original); *accord Mesa*, 878 F. Supp. 2d at 1304 (this factor "weighs against judicial assistance when the opposing party shows that the foreign tribunal actively opposes the discovery").

Here, not only is there no suggestion that the Peruvian tribunal would reject evidence gathered via Section 1782, evidence obtained through this Application will be usable in the pending Peruvian Criminal Investigation and Peruvian courts will be receptive to such evidence. Peña Decl. ¶ 18; *see also In re N. Am. Potash, Inc.*, No. 12-20637-CV, 2012 WL 12877816, at *8 (S.D. Fla. Nov. 19, 2012) ("[F]or purposes of § 1782, district courts should consider neither discoverability or admissibility in the foreign proceeding."), *report and recommendation adopted*, No. 12-20637, 2013 WL 12113190 (S.D. Fla. Mar. 13, 2013).

Other courts have already determined that evidence obtained through Section 1782 would be usable in criminal proceedings in Peru. *See Consorcio Minero*, 2011 WL 4550200, at *3 (finding this factor weighed in favor of granting a Section 1782 application seeking discovery for use in a pending criminal investigation in Peru based on an affidavit of a Peruvian lawyer stating that "rules regarding admission of evidence are 'broad' and he believes that the Peruvian tribunals will receive any evidence obtained through the application" and another affidavit of a Peruvian lawyer stating that "as the offended party in the Criminal Investigation, [the applicant] has the right to submit evidence pertinent to the matters at issue to the Criminal Prosecutor"); *see also Campos-Alvarez,* 2015 WL 1228262, at *2 (granting 1782 discovery for use in both an ongoing criminal investigation and civil proceeding in Peru, finding, "there is no indication that the Peruvian courts would not be receptive to relevant information gathered from the respondents in this federal district").

### c.  Applicants are not circumventing any foreign law proof-gathering restrictions.

Renco and Doe Run seek this discovery in good faith and are not "actively seeking to circumvent the foreign tribunal's discovery methods and restrictions," which is necessary for this factor to "counsel against section 1782 relief." *Mesa*, 878 F. Supp. 2d at 1305.  Under Peruvian law, there are no restrictions on a criminal complainant's or victim's ability lawfully to gather evidence that he may wish to provide to prosecutors to aid them in their investigation, nor would it make sense for such restrictions to exist. (Peña Decl. at 18.)

### d.  The discovery requests are not unduly intrusive or burdensome.

Lastly, the Applicants' discovery requests are not unduly intrusive or burdensome. To satisfy this requirement, the discovery requests must "appear to be narrowly tailored to the issues presented in the criminal investigation underway in [the foreign country]." *In re Application of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*, 2011 WL 181311, at *13. Here, the discovery requests are appropriately tailored to capture evidence to assist in the ongoing Peruvian Criminal Investigation. The proposed subpoena *duces tecum* seeks a discrete universe of documents relating to the criminal actions under investigation in Peru. Specifically, it seeks Careaga's testimony, and documents in his possession, custody or control, related to illicit or improper monetary transfers or inducements to potential Peruvian plaintiffs or their families; details about improper recruitment tactics used in Peru; the falsification, forgery, or improper notarization of documents; and related details of the scheme in Peru. Thus, the requests are not "unduly intrusive or burdensome."  *See Inversiones*, 2011 WL 181311, at *13 (allowing discovery under 1782 absent "specific showing" of burden or intrusive nature of request by respondent); *Mesa*, 878 F. Supp. 2d at 1306 (S.D. Fla. 2012) ("no undue burden exists because the discovery requests being compelled through this Order are sufficiently tailored.").

**B.  Under this Court's Local Rules, Section 1782 Applications Are Typically Filed *Ex Parte* and Are Restricted from Public View.**

As a general matter, applications for discovery under Section 1782 are filed *ex parte*.  *See In re Braga*, 272 F.R.D. 621, 625 (S.D. Fla. 2011) ("most § 1782 applications (at least in [the Southern District of Florida] are filed and decided *ex parte*"); *see also In re Clerici,* 481 F.3d 1324, 1333 (11th Cir. 2007) (affirming § 1782 *ex parte* order); *In re Trinidad & Tobago,* 848 F.2d 1151 (11th Cir. 1988) (affirming §1782 *ex parte* order), *abrogated on other grounds by, Intel*, 542 U.S. 241.  In this District, the default rule is that *ex parte* matters proceed in a manner similar to those filed under seal. *See* S. D. Fla. L. R. 5.4(d) ("unless the Court directs otherwise the ex-parte filing will be restricted from public view and the docket text appearing on the public docket will reflect only that a restricted filing has been made.").

Here, important reasons exist for proceeding *ex parte* keeping this proceeding under seal. Renco and Doe Run have asked the Peruvian prosecutors that the *Denuncia* "be kept confidential," and that the Peruvian Criminal Investigation likewise "be conducted confidentially." (*Denuncia*, ¶¶ III.21-22.)  What is more, the Peruvian prosecutors have ordered that the investigation be maintained as confidential under penalty of law. In the *Denuncia*, Renco and Doe Run articulated three reasons for this confidentiality request: *First*, "the people involved in this case"—including leaders of the recruitment scheme, government officials, and notaries used to perpetrate the fraud, among others—have "significant influence in various public entities" in Peru, and Renco and Doe Run do not want to give them an opportunity to improperly influence the investigation. (*Denuncia*, ¶ III.21.)  *Second*, there are legitimate concerns that if the information contained in the *Denuncia* were to become public, it might "endanger the physical integrity of various individuals who we understand wish to collaborate with the investigation." (*Id.* ¶ III.22.)  For example, Mr. Curi and Mr. Romero have already assisted in the investigation

by providing Renco and Doe Run with evidence of the fraudulent scheme, and others may be interested in doing the same.[5] *Third*, maintaining confidentiality will prevent (or at least limit) the destruction of incriminating evidence and efforts to persuade individuals not to serve as witnesses in the investigation in Peru. (*Id.* at 13.)

Therefore, Applicants respectfully request that the Court grant the Application *ex parte* and treat it as under seal. If the Court determines that the confidential information contained here should be secured in a different manner, Applicants respectfully request, prior to the publication of any such materials on the docket of this Court, the opportunity to file a motion to place the documents under seal and provide redacted versions of them.

In addition, Applicants respectfully request that the Court grant a gag order preventing Careaga from informing other parties about the subpoena, the Peruvian Criminal Investigation, this Application, and any related Court orders, without prior authorization from the Court. For example, Applicants are concerned that if Careaga were to inform other conspirators about these discovery efforts, those other conspirators might take steps to destroy relevant evidence or pressure witnesses not to cooperate with the Peruvian Criminal Investigation. A proposed order is attached as **Exhibit F**.

## CONCLUSION

WHEREFORE, Applicants, The Renco Group and The Doe Run Resources Corporation, respectfully petition this Court to enter the proposed *Ex Parte* Order attached as Exhibit F authorizing issuance of the subpoena attached as Exhibit A, and directing Discovery Target, Mr.

---

[5] Furthermore, upon information and belief, Mr. Curi, Mr. Romero and Ms. Argandoña would likely face harassment or retaliation of their roles providing testimony in support of this Application were made known. In addition, personal information has been redacted from the exhibits in accordance with Fed. R. Civ. P. 5.2 and CM/ECF Administrative Procedures, Section 6, Redaction of Personal Information, Privacy Policy, and Inappropriate Materials.

Victor Careaga, to respond to the subpoena in accordance with such Order; and to keep this matter under seal.

Dated:  April 11, 2022, Miami, Florida

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Applicants The Renco Group and The Doe Run Resources Corporation*
2525 Ponce de Leon Blvd. Suite 1000
Miami, Florida 33134
Tel.: (305) 445-2500
Fax: (305) 445-2505

By: /s/ Robert J. Kuntz, Jr
    Robert J. Kuntz, Jr.
    Florida Bar No. 94668
    rkuntz@riveromestre.com
    Jorge A. Mestre
    Florida Bar No.: 88145
    jmestre@riveromestre.com
    Amanda L. Fernandez
    Florida Bar No. 106931
    afernandez@riveromestre.com